# [ORAL ARGUMENT NOT SCHEDULED]

## No. 22-5209

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

Judicial Watch, Inc.,

Plaintiff-Appellant,

v.

U.S. Department of Justice,

Defendant-Appellee.

—————————————

On Appeal from the United States District Court
for the District of Columbia

—————————————

## BRIEF FOR APPELLEE

—————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

DANIEL TENNY
ANNA M. STAPLETON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7213*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

The parties before the district court and this Court are:

1.  Plaintiff-Appellant Judicial Watch, Inc.

2.  Defendant-Appellee United States Department of Justice

## B.    Rulings Under Review

The ruling under review (issued by Judge Royce C. Lamberth) is an order of July 20, 2022, granting defendant's motion for summary judgment.  JA 8.  A memorandum opinion accompanying the order is published at – F. Supp. 3d – (D.D.C. 2022).  JA 9-23.

## C.    Related Cases

Counsel for the government are not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Anna M. Stapleton*
Anna M. Stapleton

# TABLE OF CONTENTS

**Page**

GLOSSARY

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ........................................................3

STATEMENT OF THE ISSUE ...............................................................3

PERTINENT STATUTES AND REGULATIONS ..................................3

STATEMENT OF THE CASE ................................................................3

    A.   Statutory Background ...........................................................3

    B.   Factual Background ..............................................................6

        1.   The Events of January 6, 2021, and Subsequent
           Investigations ..............................................................6

        2.   Plaintiff's FOIA Request and the FBI's *Glomar*
           Response......................................................................7

    C.   Prior Proceedings ................................................................9

SUMMARY OF ARGUMENT ................................................................13

STANDARD OF REVIEW ......................................................................16

ARGUMENT ..........................................................................................16

The District Court Correctly Upheld the FBI's *Glomar* Response ........16

    A.   Confirming Whether or Not Responsive Records Exist
        Would Disclose Nonpublic Information About Law
        Enforcement Techniques or Procedures ..............................16

1.    The Use or Non-Use of Requests for Financial
      Transactions Data is Protected Nonpublic
      Information About a Law Enforcement Technique
      or Procedure ................................................................. 17

2.    Disclosure Could Reasonably Be Expected to
      Enable Circumvention of the Law by Future
      Wrongdoers and January 6 Participants ................... 19

B.    Plaintiff's Challenges to the *Glomar* Response Are Not
      Supported by Law or Evidence ............................................ 24

CONCLUSION ............................................................................. 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Allard K. Lowenstein Int'l Human Rights Project v.*
  *Department of Homeland Sec.*,
  626 F.3d 678 (2d. Cir. 2010) .......................................................17-18, 21

*American Civil Liberties Union v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013).............................................................5

*American Civil Liberties Union v. U.S. Dep't of Def.*,
  628 F.3d 612 (D.C. Cir. 2011).............................................................28

*American Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008).............................................................30

*Blackwell v. FBI*,
  646 F.3d 37 (D.C. Cir. 2011)........................................ 11, 18, 20, 22, 26

*CIA v. Sims*,
  471 U.S. 159 (1985) .......................................................................4

*FBI v. Abramson*,
  456 U.S. 615 (1982) .......................................................................4

*Frugone v. CIA*,
  169 F.3d 772 (D.C. Cir. 1999).......................................................11, 30

*Jaffe v. CIA*,
  573 F. Supp. 377 (D.D.C. 1983).....................................................26, 27

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) .......................................................................4

*Keys v. U.S. Dep't of Justice*,
  830 F.2d 337 (D.C. Cir. 1987).............................................................17

*Latif v. Obama,*
　　666 F.3d 746 (D.C. Cir. 2011).............................................................32

*Mayer Brown LLP v. Internal Revenue Serv.,*
　　562 F.3d 1190 (D.C. Cir. 2009)...........................................20, 21, 23, 24

*Moore v. CIA,*
　　666 F.3d 1330 (D.C. Cir. 2011).....................................................25, 28

*PHE, Inc. v. Department of Justice,*
　　983 F.2d 248 (D.C. Cir. 1993).............................................................21

*Phillippi v. CIA,*
　　546 F.2d 1009 (D.C. Cir. 1976)...........................................................6

*Public Emps. for Envtl. Responsibility v. U.S. Section,*
　　*Int'l Boundary & Water Comm'n, U.S.-Mex.,*
　　740 F.3d 195 (D.C. Cir. 2014)............................................................21

*Reporters Comm. for Freedom of the Press v. FBI,*
　　369 F. Supp. 3d 212 (D.D.C. 2019).................................................27, 28

*Roth v. U.S. Dep't of Justice,*
　　642 F.3d 1161 (D.C. Cir. 2011)...........................................................31

*Schrecker v. U.S. Dep't of Justice,*
　　349 F.3d 657 (D.C. Cir. 2003)............................................................31

*Shapiro v. U.S. Dep't of Justice,*
　　893 F.3d 796 (D.C. Cir. 2018)............................................................26

*Wolf v. CIA,*
　　473 F.3d 370 (D.C. Cir. 2007).....................................................6, 7, 16

**Statutes:**

Freedom of Information Act (FOIA):

    5 U.S.C. § 552(a)(3)(A)........................................................................4
    5 U.S.C. § 552(a)(4)(B)........................................................................3
    5 U.S.C. § 552(b)..................................................................................4
    5 U.S.C. § 552(b)(7) ........................................................................4, 5
    5 U.S.C. § 552(b)(7)(E)...............................................................17, 20

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1331 ...................................................................................3

**Regulation:**

28 C.F.R. § 16-3(b) ................................................................................8

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .....................................................................3

**Other Authorities:**

FBI, *Most Wanted: U.S. Capitol Violence*,
    https://perma.cc/G62C-AJCP ..........................................................23

U.S. Attorney's Office District of Columbia, U.S. Dep't of Justice,
    *24 Months Since the January 6 Attack on the Capitol*
    (updated Jan. 4, 2023), https://perma.cc/BF2V-JSZC ..........................7

*Webster's Third New International Dictionary* (1986):
    Procedures ..................................................................................18
    Techniques...................................................................................18

## GLOSSARY

| | |
|---|---|
| CIA | Central Intelligence Agency |
| FBI | Federal Bureau of Investigation |
| FOIA | Freedom of Information Act |

## INTRODUCTION

Plaintiff Judicial Watch, Inc. submitted a Freedom of Information Act (FOIA) request for records pertaining to an investigation by the Federal Bureau of Investigation (FBI) into the violent events at the U.S. Capitol on January 6, 2021.  Specifically, plaintiff requested all records of FBI communications to financial institutions in which the agency sought data on financial transactions in D.C., Maryland, and Virginia on January 5 and 6 as part of that investigation.  Because confirming or denying the existence or nonexistence of responsive records would disclose nonpublic details of law enforcement techniques or procedures and could create a risk of circumvention of the law, the agency issued a "*Glomar* response" declining to confirm or deny the existence of responsive records.

The district court correctly applied this Court's precedents to hold that the existence or nonexistence of responsive records is itself information that is protected under the FOIA exemption for law enforcement techniques or procedures.  In particular, revealing the existence or nonexistence of responsive records would reveal whether the FBI had communicated with financial institutions in connection

with a particular large, high-profile investigation.  Such a revelation
would both inform future wrongdoers of the FBI's methods for
conducting such investigations generally and alert participants in the
events of January 6 as to the specifics of the agency's efforts to identify
them.  Both past and future wrongdoers could exploit that knowledge to
avoid getting caught and brought to justice.

Plaintiff challenges the district court's decision on three grounds,
none of which is meritorious.  First, plaintiff mistakenly asserts that
because the FBI's ability to seek records of financial transactions
generally is known, revealing the circumstances under which the FBI
uses that law enforcement tool would not reveal any law enforcement
technique or procedure.  Second, plaintiff mistakenly relies on official
acknowledgments that do not precisely match the information being
protected.  And third, plaintiff speculates, based on unsubstantiated
media reports, that the FBI made sweeping requests for a broad swath
of financial data—a contention for which the district court found no
support in the record, even if plaintiff could have shown that it would
provide a legal basis for relief (a question the district court did not
reach).

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.  JA 4.  The district court granted summary judgment to the government and entered final judgment on July 20, 2022.  JA 8.  A timely notice of appeal was filed on August 3, 2022.  JA 3; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court correctly upheld the FBI's refusal to confirm or deny the existence of records of agency requests to financial institutions for financial transaction records as part of its investigation into the events of January 6, 2021, because doing so would disclose nonpublic details of law enforcement techniques or procedures and create a risk of circumvention of the law.

## PERTINENT STATUTES AND REGULATIONS

The pertinent statute is reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

FOIA generally mandates disclosure of federal agency records upon request, but the statute's disclosure requirement "does not apply"

3

to documents that fall within one of its enumerated exemptions. 5 U.S.C. § 552(a)(3)(A), (b). These statutory exemptions reflect Congress's judgment that "public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), because "legitimate governmental and private interests" may be damaged by releasing certain types of information, *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)). Courts must afford FOIA's exemptions "meaningful reach and application" to preserve the statute's "workable balance between the interests of the public in greater access to information and the needs of the Government to protect certain kinds of information from disclosure." *Id.* at 152, 157.

FOIA Exemption 7 applies to certain "records or information compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7). Exemption 7(E), at issue here, protects such law enforcement records from disclosure if their production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if

such disclosure could reasonably be expected to risk circumvention of the law." *Id.*

When an agency receives a FOIA request, it generally must conduct a reasonable search for responsive records, disclose whether that search identified responsive records, produce the non-exempt portions of any such records, and provide an explanation of why any responsive records were withheld under applicable FOIA exemptions. *See American Civil Liberties Union v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013). In certain circumstances, however, even confirming or denying the existence of any responsive records may reveal information that is itself subject to one or more FOIA exemptions. In those circumstances, an agency may properly refuse to confirm or deny whether it has any records responsive to the FOIA request. *Id.*

Declining to confirm or deny the existence or nonexistence of responsive records is generally referred to as a *Glomar* response.[1] A *Glomar* response is proper "if the fact of the existence or nonexistence of

---

[1] The term "*Glomar* response" comes from a seminal FOIA case in which this Court upheld the CIA's "neither confirm nor deny" response to a FOIA request for records of CIA contact with the media about a ship known as the *Hughes Glomar Explorer*. *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).

agency records falls within a FOIA exemption" using "the general exemption review standards established in non-*Glomar* cases." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  Thus, assessing the propriety of an agency's *Glomar* response requires application of the underlying FOIA exemption invoked by the agency in making that response.

### B.    Factual Background

### 1.    The Events of January 6, 2021, and Subsequent Investigations

On January 6, 2021, hundreds of people took part in a violent attack at the U.S. Capitol.  JA 9, 137 ¶ 21 (Declaration of Michael Seidel).  As has been publicly detailed, the FBI—alongside multiple federal and non-federal law enforcement entities—has been "investigating, arresting, and providing prosecutors evidence of individuals involved" in that attack.  JA 135 ¶ 16.  Many of those who participated "have yet to be identified."  JA 137 ¶ 21.  As of August 6, 2021, the FBI was seeking public assistance in identifying more than 300 individuals "believed to have committed violent acts on Capitol grounds, including over 200 who assaulted police officers."  *Id.*; *see also* U.S. Attorney's Office District of Columbia, U.S. Dep't of Justice, *24 Months Since the January 6 Attack on the Capitol* (updated Jan. 4,

2023) (noting that the FBI is still seeking public assistance in identifying more than 350 individuals).[2]

The January 6 investigation has resulted in multiple criminal cases.  As reflected in the district court record, FBI agents have provided statements in support of a number of criminal complaints describing the evidence assembled through that investigation.  *See generally* JA 54-127.  In many of those statements, the FBI witness acknowledged that he or she had reviewed records of certain financial transactions undertaken by the criminal defendant.  *See, e.g.*, JA 62 ¶ 18.  But in no case did an FBI witness state that the agency had sought financial transaction data via direct communication with a financial institution.

### 2.    Plaintiff's FOIA Request and the FBI's *Glomar* Response

Plaintiff initially submitted the following FOIA request to the FBI:

> All records of communication between the FBI and any financial institution, including but not limited to Bank of America, Citibank, Chase Manhattan Bank, Discover, and/or American Express, in which the FBI sought transaction data for those financial institutions' debit and credit account

---

[2] https://perma.cc/BF2V-JSZC

> holders who made purchases in Washington, D.C.,
> Maryland, and/or Virginia on January 5, 2021 and/or
> January 6, 2021.

JA 132 ¶ 6 (Declaration of Michael Seidel).

The FBI acknowledged receipt of plaintiff's request, JA 132 ¶ 7, and later advised plaintiff by letter that its request did not provide sufficient detail to enable agency personnel to search for responsive records with a reasonable amount of effort. JA 133 ¶ 10 (citing 28 C.F.R. § 16-3(b)). The same letter advised plaintiff that it could clarify its request by providing additional information. *Id.*

Plaintiff responded by sending a news article from Mail Online dated February 5, 2021, which asserted that the federal government sought records of financial transactions in the course of its January 6 investigation. JA 133 ¶ 11; *see also* JA 38-41 (Mail Online article). The FBI accepted that correspondence as evidence of plaintiff's intent to narrow the scope of its request to records of FBI communications seeking records of financial transactions, identified by the dates and locations specified in the original request, as part of the investigation into the events at the U.S. Capitol on January 6, 2021. JA 133 ¶ 11.

Plaintiff has not disputed that characterization of the scope of its

clarified request.  *See* Br. 3; JA 11 (district court order stating same).

The FBI's response to the clarified FOIA request stated that

"pursuant to FOIA exemption (b)(7)(E) . . . the FBI neither confirms nor

denies the existence of records as detailed in [plaintiff's] request."  JA

134 ¶ 12 (citation omitted).  The letter further explained that the Mail

Online article that plaintiff had provided "did not indicate the FBI

made any public acknowledgment as to the veracity of the article's

substance."  *Id.*

### C.    Prior Proceedings

Plaintiff initially filed suit before the FBI responded to its request,

alleging that the FBI failed to make a final determination as to its

FOIA request within statutory time limits.  *See* JA 6 (Complaint).  After

the FBI issued its response to the FOIA request, the parties cross-

moved for summary judgment regarding the adequacy of that response.

JA 9-10.

The district court granted the government's motion for summary

judgment and denied plaintiff's cross motion.  JA 9-10.  The court

concluded that the agency's *Glomar* response "met Exemption 7(E)'s

requirements" because the agency credibly explained why disclosing the existence or non-existence of responsive records "'would enable investigative subjects to circumvent similar and currently used techniques.'" JA 19 (quoting JA 138 ¶ 22). The court noted that a risk of circumvention of the law "plausibly exists for future wrongdoers who, through disclosure of these records, would learn about how the FBI obtains, or does not obtain, financial transaction information in investigations like this one" and "also plausibly exists for individual subjects in the January 6 investigation," who might "employ 'compensating measures'" based on the FBI's response to the request. JA 21. Under this Court's precedents, the court held, the FBI's explanation of these risks was sufficient to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." JA 18 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)); JA 20.

The district court rejected plaintiff's attempts to challenge the legitimacy and sufficiency of the FBI's response. First, it rejected plaintiff's assertions that the agency had previously disclosed the existence of responsive records. The court rejected plaintiff's reliance

10

on press accounts on the ground that a "plaintiff cannot meet the burden of demonstrating prior disclosure when the prior disclosure of information was made by someone other than the agency from which the information is sought."  JA 15 (citing *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999)).  And the court rejected plaintiff's reliance on various disclosures by the FBI because none of them revealed the precise information at issue here: whether the FBI communicated with financial institutions to obtain financial records in connection with the January 6 investigation.  Court statements by FBI witnesses referred to financial documents but not to the methods of obtaining them, and the agency's response to a prior set of FOIA requests provided information about a broader date range that was not specific to the investigation into January 6.  *Id.* at 16-18.

Second, the court rejected plaintiff's assertion that Exemption 7(E) did not apply because the FBI's use of financial records for investigations, in general, is publicly known and therefore not a protected technique or procedure.  JA 19.  "Even if a defendant knows that the FBI could generally seek financial information" in the course of investigations, the court acknowledged, "no confirmation one way or the

11

other has been made for the January 6 investigation." JA 20. Thus, the court concluded, "[a]n acknowledgment in either direction would give insight into how the FBI investigates matters like this one" and would also "specifically reveal how it has chosen to identify subjects for its January 6 investigation." *Id.*

Finally, the court addressed plaintiff's "bold contention" that the FBI "engaged in improper behavior sufficient to deny use of Exemption 7(E)." JA 21. Although plaintiff averred that the FBI "could have acted improperly if it had communicated with companies seeking financial information," the court observed that plaintiff provided "scant evidence for this argument." JA 21. Plaintiff attempted to rely on "an opinion piece on the Fox News website along with (what appears to be) the public-comment section for the article," JA 21; a Mail Online article "based solely on the claims made in the Fox News opinion piece," JA 22; and a declaration that offered "no personal knowledge regarding the veracity" of plaintiff's allegations. JA 22. As the district court concluded, none of those sources is sufficient to "overcome the presumption of good faith and regularity" to which the agency's actions are entitled, even if it was "proper to consider possible impropriety

12

underlying a Glomar response under Exemption 7(E)," an issue the
court did not decide.  JA 22 & n.4.  Accordingly, the court held "that the
Glomar response was justified under FOIA Exemption 7(E)" and
granted the government's motion for summary judgment.  JA 23.

## SUMMARY OF ARGUMENT

The district court correctly upheld the FBI's *Glomar* response
invoking FOIA Exemption 7(E).  Plaintiff made a FOIA request for FBI
records of communications with financial institutions, as part of its
investigation into the events of January 6, in which the agency sought
records of financial transactions made in D.C., Maryland, and Virginia
on January 5 or 6, 2021.  As the FBI has explained, confirming or
denying the existence or non-existence of responsive records would risk
circumvention of the law by both future wrongdoers and participants in
the events of January 6.  If the FBI were to confirm having requested
financial transactions data from financial institutions, future
wrongdoers would have valuable information about how the FBI
conducts investigations of this kind, and January 6 participants who
learned that their transactions would likely be discovered might
undertake evasive actions such as destroying other evidence of their

participation in the events at the U.S. Capitol.  On the other hand, were the FBI to deny having used that procedure, future wrongdoers could infer that the agency would take a similar approach in future investigations, and January 6 participants might believe they are less likely to be caught and so be more reticent to come forward.

Plaintiff's arguments to the contrary fail.  First, plaintiff argues that because it is generally known that the FBI sometimes seeks financial records in the course of its investigations, disclosing whether the FBI did so in connection to this particular investigation could not reveal any nonpublic techniques or procedures.  Neither the statute nor the case law imposes such a restriction.  Even when it is generally known that a law enforcement agency makes use of certain law enforcement tools, the details of how and under what circumstances the agency does so remain protected by the FOIA exemption.

Second, plaintiff alleges that the agency has publicly acknowledged seeking records from financial institutions and so cannot refuse to confirm having done so.  Although the FBI has publicly disclosed that it obtained financial records in some instances, none of the "official acknowledgments" identified by plaintiff contains a

14

statement by the agency that it obtained such records in connection

with the January 6 investigation via direct communications with

financial institutions—the only sort of communications that would give

rise to responsive records.  The alleged acknowledgments thus do not

match the information that the FOIA request sought, as this Court's

precedents require.

Finally, plaintiff alleges that any responsive records were

obtained pursuant to a broad and indiscriminate request for the

financial records of thousands of individuals, the vast majority of whom

are law-abiding citizens not suspected of any wrongdoing.  But as the

district court explained, even if such an allegation of wrongdoing could

defeat a *Glomar* response, plaintiff offers no evidence, apart from

speculation in the media, to support that extraordinary claim.  Media

rumors that the agency engaged in improper activities are not sufficient

to overcome the presumption of regularity to which government action

is entitled.

Because the FBI has logically explained its need to avoid

confirming or denying the existence of responsive records, and plaintiff

has failed to overcome that showing, the district court's grant of summary judgment to the government should be affirmed.

## STANDARD OF REVIEW

This Court reviews de novo an agency's invocation of a FOIA exemption to support its *Glomar* response. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

## ARGUMENT

### THE DISTRICT COURT CORRECTLY UPHELD THE FBI'S *GLOMAR* RESPONSE

#### A. Confirming Whether or Not Responsive Records Exist Would Disclose Nonpublic Information About Law Enforcement Techniques or Procedures

FOIA Exemption 7(E) shields records "compiled for law enforcement purposes" whose release "would disclose techniques and procedures for law enforcement investigations" if "such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Plaintiff does not contest that the records requested in this case were compiled for law enforcement purposes because the request, as clarified, was explicitly tied to the FBI's investigation of the events of January 6. *See Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 340 (D.C. Cir. 1987) (records are compiled for law enforcement purposes

16

whenever there is "a nexus between the agency's activity . . . and its law enforcement duties"); Br. 8 (referring to "seeking records of financial transactions" as a "law enforcement technique").  As the district court properly recognized, the record in this case demonstrated that confirming or denying the existence of responsive records (1) would disclose a law enforcement technique or procedure and (2) could reasonably be expected to risk circumvention of the law.

> 1.   **The Use or Non-Use of Requests for Financial Transactions Data is Protected Nonpublic Information About a Law Enforcement Technique or Procedure**

Although the statute does not define "techniques or procedures," those words broadly refer to "how law enforcement officials go about investigating a crime."  *Allard K. Lowenstein Int'l Human Rights Project v. Department of Homeland Sec.* (*Lowenstein*), 626 F.3d 678, 682 (2d. Cir. 2010) (citing *Webster's Third New International Dictionary* (1986)).  The category therefore includes both highly technical information and more mundane or routine procedures, so long as the details are not known to the public.  For example, this Court has upheld the application of Exemption 7(E) to both "details about procedures used during the forensic examination of a computer" and "methods of

17

data collection, organization, and presentation." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).

The technique or procedure at issue here relates to communications with financial institutions to obtain financial-transaction data in the course of an investigation. By either confirming or denying the existence of responsive records, the agency would be disclosing information that has not been publicly disclosed before: whether it has sought transaction data through communications with financial institutions in the course of its investigation into the violent events at the U.S. Capitol on January 6, 2021. JA 131 ¶ 5, 136 ¶ 19. That disclosure would provide nonpublic information about the methods the FBI has used or might use to seek financial records and the kinds of cases in which it is likely to do so.

In particular, as the FBI explained in a declaration, "[c]onfirming or denying the existence of responsive records, especially concerning the FBI's collection methodology, would disclose the identity of methods used in collecting and analyzing information, including how and from where the FBI collects information." JA 163 ¶ 12. Communication with financial institutions is one possible method by which the agency could

18

obtain financial records but not the only method.  FBI may, for

example, ask other law enforcement agencies—including the several

that are involved in the January 6 investigation—to share records they

have obtained.  Thus, the FBI's public acknowledgment that agents

reviewed financial records did not disclose the information at issue here

regarding the method by which the agency sought those records.  *See,

e.g.,* JA 62 ¶ 18 (FBI witness statement that "[f]inancial records from

Bank of America corroborate that [the defendant] used his Bank of

America account to complete financial transactions with [an airline]" on

January 5 without explaining how the FBI obtained those records).

### 2. Disclosure Could Reasonably Be Expected to Enable Circumvention of the Law by Future Wrongdoers and January 6 Participants

The district court also correctly concluded that disclosure could

risk circumvention of the law.  The bar for demonstrating a reasonably

expected risk of circumvention is "relatively low," *Blackwell*, 646 F.3d at

42.  The statute's text makes clear that the exemption may be invoked

even in the face of a great deal of uncertainty about the relative risk of

disclosure, requiring only that disclosure "could reasonably be expected

to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E); *see Mayer*

*Brown LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) ("In short, the exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.").  It is therefore sufficient for the agency to "demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law." *Mayer Brown*, 562 F.3d at 1194 (alterations in original) (quoting *PHE, Inc. v. Department of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993)).[3]

---

[3] The threshold for showing a risk of circumvention is so low, in fact, that this Court has generally applied the requirement that disclosure risk circumvention of the law to cases involving techniques and procedures without addressing the Second Circuit's conclusion that it applies only to records involving "guidelines," explaining that "it is not clear that the difference matters much in practice." *Public Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 204 n.4 (D.C. Cir. 2014); *see Lowenstein*, 626 F.3d at 681 ("The sentence structure of Exemption (b)(7)(E) indicates that the qualifying phrase ('if such disclosure could reasonably be expected to risk circumvention of the law') modifies only 'guidelines' and not 'techniques and procedures.'").  Here, similarly, the government has readily satisfied the requirement, so this Court again need not resolve whether it applies.

As this Court has recognized, the statute's concern for circumvention of the law extends both to crimes that have already occurred and to those that may occur in future. The exemption protects information that "those who have already [violated] laws" may use either to escape justice or "when deciding whether to come forward." *Mayer Brown*, 562 F.3d at 1194. And it also applies to information whose disclosure could enable future criminals "to employ countermeasures to avoid detection" in ways that would "jeopardiz[e]" efforts to bring them to justice. *Blackwell*, 646 F.3d at 42 (quotation marks omitted).

Here, either confirming or denying that the FBI communicated with financial institutions as part of the January 6 investigation would give rise to both kinds of risks that this Court has recognized as independently sufficient. The January 6 investigation concerns a particular type of incident involving a set of highly public criminal acts by hundreds of potential perpetrators whose identities may not be known. Revealing how the FBI has conducted its investigations into this particular event would necessarily disclose both "the identity of methods" and "the circumstances under which specific techniques were

21

used," creating an inference that the agency would use similar approaches to investigate future events with similar characteristics.  JA 138 ¶ 22.  Thus, revealing the types of inquiries in which the FBI engages to identify or confirm the identity of perpetrators risks giving future wrongdoers a roadmap to "circumvent similar and currently used techniques" such that the "relative utility of these techniques could be diminished."  JA 138 ¶ 22.

In addition, knowledge about the existence or nonexistence of responsive records would potentially assist January 6 participants in their efforts to evade justice.  The events of January 6 involved hundreds of people, many of whom—at the time of the request—had not yet been identified and may not have known whether the FBI will be able to identify them.  JA 137 ¶ 21; *see also* FBI, *Most Wanted: U.S. Capitol Violence*, https://perma.cc/G62C-AJCP (continuing to seek public assistance in identifying suspects). "[I]f the FBI confirmed the existence of [responsive] records, any of those individuals who made debit- or credit-card purchases in the D.C. area on January 5 or 6[] . . . would be more likely to take compensating measures to destroy or obscure evidence of their activities on January 6."  JA 137-38 ¶ 21.  But

so too could the law be circumvented if the FBI were to confirm that no

such records existed because "it would expose an investigative gap for

exploitation."  JA 138 ¶ 21; *see also Mayer Brown*, 562 F.3d at 1194

(noting that "those who have already" violated the law "may use the

information when deciding whether to come forward").

Both risks are further heightened by the fact that individual FOIA

requests do not exist in a vacuum.  Requiring the confirmation or denial

of the existence of responsive records in this and other, similar requests

"would facilitate the accumulation of information by investigative

subjects" about which techniques were or were not used in a given set of

circumstances.  JA 138 ¶ 22.  By piecing together the agency's responses

to various requests, both January 6 participants and future

lawbreakers could assemble a detailed and comprehensive picture of the

methods the FBI may deploy to catch them.  Information regarding how

the FBI conducts a broad investigation involving a large number of

perpetrators could reasonably be expected to risk at least some

individuals being able to avoid or counteract the FBI's preferred

techniques for identifying wrongdoers, in the context of either the

January 6 investigation or a future incident.  As this Court has

recognized, Exemption 7(E) protects information whose disclosure

would assist perpetrators to structure their activities "so as to avoid the

maximum enforcement efforts." *Mayer Brown*, 562 F.3d at 1194.

### B.   Plaintiff's Challenges to the *Glomar* Response Are Not Supported by Law or Evidence

When an agency issues a *Glomar* response, plaintiffs may bring

two types of challenges.  First, they may challenge the denial of

disclosure on the merits by attempting to demonstrate that the

withheld information does not fall within the category invoked by the

agency—here, Exemption 7(E).  Second, they may make what is called

an "official acknowledgment" challenge by asserting that the agency has

previously acknowledged the existence of the requested records.  *See*

*Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011).  Plaintiff challenged

the FBI's response on both grounds and also raised a third argument:

that a *Glomar* response is not available because the records, if they

exist, would demonstrate improper action by the FBI.  The district court

correctly rejected all three arguments.

1.  Plaintiff misunderstands the relevant inquiry when it points

out that "seeking records of financial transactions is a 'commonly

known' law enforcement technique."  Br. 8.  The *Glomar* response here

24

was appropriate not because the FBI needed to shield from disclosure the fact that it sometimes seeks records of financial transactions, but rather because it is not publicly known whether the FBI did so in connection with this investigation—information that could, as discussed above, reveal the FBI's investigative methods. This Court has repeatedly upheld the invocation of Exemption 7(E) in similar circumstances, when the general availability of a law enforcement tool was publicly known but the specifics of the government's use of that tool were not. *See Shapiro v. U.S. Dep't of Justice*, 893 F.3d 796, 800-01 (D.C. Cir. 2018) (affirming the invocation of Exemption 7(E) to avoid disclosing "specifically how it uses [publicly known] search functionality or which searches it performed in [a particular] case"); *Blackwell*, 646 F.3d at 42 (finding same for "details about procedures used during the forensic examination of a computer" (quotation marks omitted)).

Unable to support its limited conception of the exemption with any precedent from this Court, plaintiff relies on a 1983 decision of the district court. Br. 7 (quoting *Jaffe v. CIA*, 573 F. Supp. 377, 387 (D.D.C. 1983)). On its own terms, that case does not help plaintiff. In *Jaffe*, the court upheld the government's invocation of Exemption 7(E) to

25

documents relating to "law enforcement procedures not known to the public." *Jaffe*, 573 F. Supp. at 387.  The court thus had no occasion to opine on whether the exemption also applied to nonpublic information relating to the usage of tools whose existence was known to the public, which was not at issue there.  Its only statement on the subject recited the unremarkable proposition that Exemption 7(E) "does not encompass[] . . . ordinary manuals or procedures unless they include confidential details of law enforcement programs." *Id.*

Plaintiff fares no better in citing *Reporters Committee for Freedom of the Press v. FBI*, 369 F. Supp. 3d 212 (D.D.C. 2019).  *See* Br. 8. There, the government's use of a particular law enforcement method in one instance was well documented, *Reporters Comm. for Freedom of the Press*, 369 F. Supp. 3d at 223, and the district court held that the government could not issue a *Glomar* response regarding the existence or nonexistence of records reflecting the use of that method more generally.  In particular, the court observed that (unlike here), a *Glomar* response was not necessary to avoid revealing whether the method was used in any particular investigation "because all a criminal would know is the existence of an unquantified number of records."  *See*

26

*id.* at 224. Confirming the mere existence of some number of responsive records thus would not, on the record there, provide potential wrongdoers with any more information than the agency had previously disclosed. *Id.* at 225. The court did not suggest that Exemption 7(E) could not apply at all if it was known that the FBI used a particular method as a general matter; to the contrary, it acknowledged that the exemption might apply to the records requested in that very case. *Id.*

2. Plaintiff next argues that the FBI's *Glomar* response is barred by the "official acknowledgment" rule because the agency has previously acknowledged the existence of the requested records. *See* Br. 9-13. This Court applies a strict tripartite test to asserted claims of official acknowledgement: "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *Moore*, 666 F.3d at 1333 (quoting *American Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 620-21 (D.C. Cir. 2011)). As the district court correctly concluded, none of plaintiff's cited "disclosures" meets this strict standard. *See* JA 14-18.

27

First, plaintiff points to statements submitted by FBI agents in criminal cases against January 6 defendants indicating that the agents have reviewed certain financial records. Br. 10-12 (citing statements beginning at JA 54, 69, 79, 88, and 99). As described above, the information disclosed in those statements does not "match" the information plaintiff requested under the FOIA. None of the submitted statements states whether the agency sought transaction data from any financial institution. *See* JA 62 (stating affiant "received records from Expedia" and "[f]inancial records from Bank of America" corroborate the Expedia records); JA 75 (stating "PNC Bank provided records" of five transactions completed on January 6); JA 85 (citing "[f]inancial records obtained from JP Morgan Chase bank"); JA 90 (citing "[s]ubpoena results from [subject's] Citibank credit card); JA 109 (describing a review of a "small business checking account" for which the defendant was one of two authorized signers). Because these affidavits do not disclose the existence of the specific types of records sought in the FOIA request, they do not constitute official disclosures sufficient to invalidate the FBI's *Glomar* response.

Next, plaintiff invokes the FBI's response to a FOIA request submitted by Dan Heily. Br. 12-13 (citing JA 46-53). Among other records not relevant to this case, Heily requested "the forms [the FBI] issued to each financial institution to obtain financial data during the period December 5, 2020[,] through February 6, 2021." JA 50. Rather than issue a *Glomar* response, the FBI confirmed the existence of responsive records but asserted they were exempt from disclosure. *See* JA 52 (FBI response to Heily request). But that did not disclose the information at issue here. Rather, it merely disclosed that, at some point between December 5, 2020, and February 6, 2021, the FBI sent a form to a financial institution somewhere in the FBI's jurisdiction and that the record of that interaction is part of some investigative file. It does not follow that as "part of the investigation into the events at the Capitol on January 6, 2021," the FBI sent any communication to any financial institution seeking data about "purchases in Washington, D.C., Maryland and/or Virginia on January 5, 2021 and/or January 6, 2021." JA 132 ¶ 6.

Plaintiff properly does not advance the argument that the Mail Online article "is an official acknowledgment." JA 14 (citing JA 133

¶ 11); *see American Wildlands v. Kempthorne*, 530 F.3d 991, 1001-02 (D.C. Cir. 2008) (arguments not raised in opening brief are forfeited). As the district court explained, the article is not an official acknowledgment because any disclosure it contains "was made by someone other than the agency from which the information is sought." JA 15 (citing *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999)).

3. Finally, plaintiff asserts—citing cases that address the balancing of public and private interests under Exemption 7(C), *see Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003); *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1181-82 (D.C. Cir. 2011)— that the requested records constitute evidence of "use of improper 'techniques or procedures'" and so cannot be shielded by the FOIA exemptions. Br. 13. Specifically, plaintiff asserts that the FBI "sought and received records from financial institutions of anyone who used a credit card or engaged in other transactions in the Washington, DC area on January 5 or 6, 2021." Br. 1. Even assuming plaintiff's legal premise that impropriety precludes the invocation of Exemption 7(E)— an issue the district court did not reach—this argument fails on its own terms. As the district court explained, plaintiff cites no viable evidence

that the agency made any such broad and untargeted request, relying instead on unsupported allegations in media stories.

Plaintiff states that "the FBI appears to have conducted an improper, broad sweep of financial records" based on what it describes as "[d]etailed media reports." Br. 14. These "reports" consist of two articles. The first is an opinion piece citing unspecified "exclusively obtained evidence" regarding actions allegedly taken by one bank, JA 26, and claiming that the bank "confirmed it actually happened by not denying it," JA 28. The second is an internet article that appears to get its information entirely from the opinion piece. *See* JA 39-41. As the district court correctly stated, such "speculative allegations of impropriety" cannot overcome the presumption of regularity to which the agency's actions are entitled, much less provide support for plaintiff's claim that the FBI "sought and received records from financial institutions of anyone who used a credit card or engaged in other transactions in the Washington, DC area on January 5 or 6, 2021." Br. 1; JA 22; *see also* JA 21 (discussing *Latif v. Obama*, 666 F.3d 746 (D.C. Cir. 2011)).

31

Plaintiff's acknowledgment that the FBI could seek financial records through "several legal avenues" underscores that the existence of responsive records would not necessarily be evidence of an improperly broad sweep.  Br. 14.  The government is not seeking to conceal whether it engaged in that extreme conduct, but rather permissibly declining to disclose information regarding the use of law enforcement techniques or procedures that could aid wrongdoers in circumvention of the law, as the district court properly found.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

DANIEL TENNY
  */s/ Anna M. Stapleton*
ANNA M. STAPLETON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7213*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*
  *Anna.m.stapleton@usdoj.gov*

January 2023

33

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,152 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.


*/s/ Anna M. Stapleton*
Anna M. Stapleton

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Anna M. Stapleton*
Anna M. Stapleton

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 552(b)(7) ................................................................. A1

**5 U.S.C. § 552(b)(7)**

**§ 552. Public information; agency rules, opinions, orders, records, and proceedings.**

. . .

(b)  This section does not apply to matters that are--

. . .

(7)  records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

. . . .

A1